# DEPARTMENT OF THE AIR FORCE ET AL. *v.* ROSE ET AL.

No. 74–489.  Argued October 8, 1975—Decided April 21, 1976

354

BRENNAN, J., delivered the opinion of the Court, in which STEW-ART, WHITE, MARSHALL, and POWELL, JJ., joined. BURGER, C. J., *post*, p. 382, BLACKMUN, J., *post*, p. 385, and REHNQUIST, J., *post*, p. 389, filed dissenting opinions. STEVENS, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Friedman* argued the cause for petitioners. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Lee, Acting Assistant Attorney General Jaffe, Allan Abbot Tuttle, Leonard Schaitman,* and *Donald Etra.*

*Barrington D. Parker, Jr.,* argued the cause for respondents. With him on the brief were *Melvin L. Wulf* and *John H. F. Shattuck.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Respondents, student editors or former student editors of the New York University Law Review researching

disciplinary systems and procedures at the military service academies for an article for the Law Review,[1] were denied access by petitioners to case summaries of honor and ethics hearings, with personal references or other identifying information deleted, maintained in the United States Air Force Academy's Honor and Ethics Code reading files, although Academy practice is to post copies of such summaries on 40 squadron bulletin boards throughout the Academy and to distribute copies to Academy faculty and administration officials.[2] Thereupon respondents brought this action under the Freedom of Information Act, as amended, 5 U. S. C. § 552 (1970 ed. and Supp. V), in the District Court for the Southern District of New York against petitioners, the Department

---

[1] Respondent Michael T. Rose, a graduate of the United States Air Force Academy and at that time a First Lieutenant in the Air Force, was the student editor charged with preparing the study. It finally appeared as a book, M. Rose, A Prayer for Relief: The Constitutional Infirmities of the Military Academies' Conduct, Honor and Ethics Systems (NYU 1973). Respondents Lawrence B. Pedowitz and Charles P. Diamond were, at the time this suit was filed, respectively the former and current Editor-in-Chief of the Review.

[2] Upon respondent Rose's request for documents, Academy officials gave him copies of the Honor Code, the Honor Reference Manual, Lesson Plans, Honor Hearing Procedures, and various other materials explaining the Honor and Ethics Codes. They denied him access to the case summaries, however, on the grounds that even with the names deleted "[s]ome cases may be recognized by the reader by the circumstances alone without the identity of the cadet given" and "[t]here is no way of determining just how these facts will be or could be used." App. 21, 155. On appeal to the Secretary of the Air Force, the Secretary, by letter from his Administrative Assistant, refused disclosure of the case summaries on the ground that they were exempted from disclosure by Exemption 6 of the Freedom of Information Act, 5 U. S. C. § 552 (b)(6), and by Air Force Regulations 12–30, ¶¶ 4 (f) and 4 (g)(1)(b), 32 CFR §§ 806.5 (f), (g)(1)(ii) (1974), App. 21, 121–122.

of the Air Force and Air Force officers who supervise
cadets at the United States Air Force Academy (herein-
after collectively the Agency).[3]   The District Court
granted petitioner Agency's motion for summary judg-

---

[3] The Freedom of Information Act, 5 U. S. C. § 552 (1970 ed. and
Supp. V), provides in pertinent part:

"(a) Each agency shall make available to the public information as
follows:

.        .        .        .

"(3) Except with respect to the records made available under
paragraphs (1) and (2) of this subsection, each agency, upon any
request for records which (A) reasonably describes such records
and (B) is made in accordance with published rules stating the time,
place, fees (if any), and procedures to be followed, shall make the
records promptly available to any person.

"(4)(A) . . . .

"(B) On complaint, the district court of the United States in the
district in which the complainant resides, or has his principal place
of business, or in which the agency records are situated, or in the
District of Columbia, has jurisdiction to enjoin the agency from
withholding agency records and to order the production of any
agency records improperly withheld from the complainant.   In such
a case the court shall determine the matter de novo, and may ex-
amine the contents of such agency records in camera to determine
whether such records or any part thereof shall be withheld under
any of the exemptions set forth in subsection (b) of this section,
and the burden is on the agency to sustain its action.

.        .        .        .        .

"(b) This section does not apply to matters that are—

.        .        .        .        .

"(2) related solely to the internal personnel rules and practices
of an agency;

.        .        .        .        .

"(6) personnel and medical files and similar files the disclosure of
which would constitute a clearly unwarranted invasion of personal
privacy;

.        .        .        .

"Any reasonably segregable portion of a record shall be provided to
any person requesting such record after deletion of the portions
which are exempt under this subsection.

"(c) This section does not authorize withholding of information

ment—without first requiring production of the case summaries for inspection—holding in an unreported opinion that case summaries even with deletions of personal references or other identifying information were "matters . . . related solely to the internal personnel rules and practices of an agency," exempted from mandatory disclosure by § 552 (b)(2) of the statute.[4] The Court of Appeals for the Second Circuit reversed, holding that § 552 (b)(2) did not exempt the case summaries from mandatory disclosure. 495 F. 2d 261 (1974). The Agency argued alternatively, however, that the case summaries constituted "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," exempted from mandatory disclosure by § 552 (b)(6). The District Court held this exemption inapplicable to the case summaries, because it concluded that disclosure of the summaries without names or other identifying information would not subject any former cadet to public identification and stigma, and the possibility of identification by another former cadet could not, in the context of the Academy's practice of distribution and official posting of the summaries, constitute an invasion of personal privacy proscribed by § 552

---

or limit the availability of records to the public, except as specifically stated in this section. . . ."

[4] Respondents also sought access to a complete study of resignations of Academy graduates from the Air Force. The Agency claimed that the study was exempted from disclosure by 5 U. S. C. § 552 (b)(5), concerning "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The District Court held that since the study had already been offered for dissemination to the public the Agency had waived its rights under the exemption, and accordingly it granted respondents partial summary judgment, requiring the Agency to disclose the complete study to respondents. Pet. for Cert. 35A–38A. The Agency complied with this order.

(b)(6). Pet. for Cert. 32A. The Court of Appeals disagreed with this approach, stating that it "ignores certain practical realities" which militated against the conclusion "that the Agency's internal dissemination of the summaries lessens the concerned cadets' right to privacy, as embodied in Exemption six." 495 F. 2d, at 267. But the court refused to hold, on the one hand, either "that [the Agency] must now, without any prior inspection by a court, turn over the summaries to [respondents] with only the proper names removed . . ." or, on the other hand, "that Exemption Six covers all, or any part of, the summaries in issue." *Id.,* at 268. Rather, the Court of Appeals held that because the Agency had not carried its burden in the District Court, imposed by the Act, of "sustain[ing] its action" by means of affidavits or testimony, further inquiry was required, and "the Agency must now produce the summaries themselves in court" for an *in camera* inspection

> "and cooperate with the judge in redacting the records so as to delete personal references and all other identifying information. . . . We think it highly likely that the combined skills of court and Agency, applied to the summaries, will yield edited documents sufficient for the purpose sought and sufficient as well to safeguard affected persons in their legitimate claims of privacy." *Ibid.* (Footnotes omitted.)

We granted certiorari, 420 U. S. 923 (1975). We affirm.

I

The District Court made factual findings respecting the administration of the Honor and Ethics Codes at the Academy. See Pet. for Cert. 28A–29A, nn. 5, 6. Under the Honor Code enrolled cadets pledge: "We will not lie, steal, or cheat, nor tolerate among us any-

one who does." The Honor Code is administered by an Honor Committee composed of Academy cadets. Suspected violations of the Code are referred to the Chairman of the Honor Committee, who appoints a three-cadet investigatory team which, with advice from the legal adviser, evaluates the facts and determines whether a hearing before an Honor Board of eight cadets, is warranted. If the team finds no hearing warranted, the case is closed. If it finds there should be a hearing, the accused cadet may call witnesses to testify in his behalf, and each cadet squadron may ordinarily send two cadets to observe.

The Board may return a guilty finding only upon unanimous vote. If the verdict is guilty, under certain circumstances the Board may grant the guilty cadet "discretion," for which a vote of six of the eight members is required. A verdict of guilty with discretion is equivalent to a not-guilty finding in that the cadet is returned to his cadet squadron in good standing. A verdict of guilty without discretion results in one of three alternative dispositions: the cadet may resign from the Academy, request a hearing before a Board of Officers, or request a trial by court-martial.

At the announcement of the verdict, the Honor Committee Chairman reminds all cadets present at the hearing that all matters discussed at the hearing are confidential and should not be discussed outside the room with anyone other than an honor representative. A case summary consisting of a brief statement, usually only one page, of the significant facts is prepared by the Committee. As we have said, copies of the summaries are posted on 40 squadron bulletin boards throughout the Academy, and distributed among Academy faculty and administration officials. Cadets are instructed not to read the summaries, unless they have a need, beyond mere curiosity, to know their contents, and the reading

files are covered with a notice that they are "for official use only." Case summaries for not-guilty and discretion cases are circulated with names deleted; in guilty cases, the guilty cadet's name is not deleted from the summary, but posting on the bulletin boards is deferred until after the guilty cadet has left the Academy.

Ethics Code violations are breaches of conduct less serious than Honor Code violations, and administration of Ethics Code cases is generally less structured, though similar. In many instances, ethics cases are handled informally by the cadet squadron commander, the squadron ethics representative, and the individual concerned. These cases are not necessarily written up and no complete file is maintained; a case is written up and the summary placed in back of the Honor Code reading files only if it is determined to be of value for the cadet population. Distribution of Ethics Code summaries is substantially the same as that of Honor Code summaries, and their confidentiality, too, is maintained by Academy custom and practice.

## II

Our discussion may conveniently begin by again emphasizing the basic thrust of the Freedom of Information Act, 5 U. S. C. § 552 (1970 ed. and Supp. V). We canvassed the subject at some length three years ago in *EPA v. Mink,* 410 U. S. 73, 79–80 (1973), and need only briefly review that history here. The Act revises § 3, the public disclosure section, of the Administrative Procedure Act, 5 U. S. C. § 1002 (1964 ed.). The revision was deemed necessary because "Section 3 was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute." *Mink, supra,* at 79. Congress therefore structured a revision whose basic purpose reflected "a general philosophy of full agency disclosure unless in-

formation is exempted under clearly delineated statutory language." S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965) (hereinafter S. Rep. No. 813). To make crystal clear the congressional objective—in the words of the Court of Appeals, "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," 495 F. 2d, at 263—Congress provided in § 552 (c) that nothing in the Act should be read to "authorize withholding of information or limit the availability of records to the public, except as specifically stated . . . ." Consistently with that objective, the Act repeatedly states "that official information shall be made available 'to the public,' 'for public inspection.' " *Mink, supra,* at 79. There are, however, exemptions from compelled disclosure. They are nine in number and are set forth in § 552 (b). But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act. "These exemptions are explicitly made exclusive, 5 U. S. C. § 552 (c) . . . ," *Mink, supra,* at 79, and must be narrowly construed. *Vaughn* v. *Rosen,* 157 U. S. App. D. C. 340, 343, 484 F. 2d 820, 823 (1973); 173 U. S. App. D. C. 187, 193, 523 F. 2d 1136, 1142 (1975); *Soucie* v. *David,* 145 U. S. App. D. C. 144, 157, 448 F. 2d 1067, 1080 (1971). In sum, as said in *Mink, supra,* at 80:

> "Without question, the Act is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands. Subsection (b) is part of this scheme and represents the congressional determination of the types of information that the Executive Branch must have the option to keep confidential, if it so chooses. As the Senate Committee explained, it was

not 'an easy task to balance the opposing interests, but it is not an impossible one either. . . . Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure.' S. Rep. No. 813, p. 3."

Mindful of the congressional purpose, we then turn to consider whether mandatory disclosure of the case summaries is exempted by either of the exemptions involved here, discussing, *first*, Exemption 2, and, *second*, Exemption 6.

## III

The phrasing of Exemption 2 is traceable to congressional dissatisfaction with the exemption from disclosure under former § 3 of the Administrative Procedure Act of "any matter relating solely to the internal management of an agency." 5 U. S. C. § 1002 (1964 ed.). The sweep of that wording led to withholding by agencies from disclosure of matter "rang[ing] from the important to the insignificant." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 5 (1966) (hereinafter H. R. Rep. No. 1497). An earlier effort at minimizing this sweep, S. 1666 introduced in the 88th Congress in 1963, applied the "internal management" exemption only to matters required to be published in the Federal Register; agency orders and records were exempted from other public disclosure only when the information related "solely to the internal personnel rules and practices of any agency." The distinction was highlighted in the Senate Report on S. 1666 by reference to the latter as the "more tightly drawn" exempting language. S. Rep. No. 1219, 88th Cong., 2d Sess., 12 (1964).

No final action was taken on S. 1666 in the 88th Congress; the Senate passed the bill, but it reached the

House too late for action. *Renegotiation Board* v. *Bannercraft Clothing Co.*, 415 U. S. 1, 18 n. 18 (1974). But the bill introduced in the Senate in 1965 that became law in 1966 dropped the "internal management" exemption for matters required to be published in the Federal Register and consolidated all exemptions into a single subsection. Thus, legislative history plainly evidences the congressional conclusion that the wording of Exemption 2, "internal personnel rules and practices," was to have a narrower reach than the Administrative Procedure Act's exemption for "internal management" matters.

But that is not the end of the inquiry. The House and Senate Reports on the bill finally enacted differ upon the scope of the narrowed exemption. The Senate Report stated:

> "Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like." S. Rep. No. 813, p. 8.

The House Report, on the other hand, declared:

> "2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all 'matters of internal management' such as employee relations and working conditions and routine administrative procedures which are withheld under the present law." H. R. Rep. No. 1497, p. 10.

Almost all courts that have considered the difference between the Reports have concluded that the Senate Report more accurately reflects the congressional pur-

pose.[5] Those cases relying on the House, rather than the Senate, interpretation of Exemption 2, and permitting agency withholding of matters of some public interest, have done so only where necessary to prevent the circumvention of agency regulations that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function. See, *e. g., Tietze* v. *Richardson*, 342 F. Supp. 610 (SD Tex. 1972); *Cuneo* v. *Laird*, 338 F. Supp. 504 (DC 1972), rev'd on other grounds *sub nom. Cuneo* v. *Schlesinger*, 157 U. S. App. D. C. 368, 484 F. 2d 1086 (1973); *City of Concord* v. *Ambrose*, 333 F. Supp. 958 (ND Cal. 1971) (dictum). Moreover, the legislative history indicates that this was the primary concern of the committee drafting the House Report. See Hearings on H. R. 5012 before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 29–30 (1965), cited in H. R. Rep. No. 1497, p. 10 n. 14. We need not consider in this case the applicability of Exemption 2 in such circumstances, however, because, as the Court of Appeals recognized, this is not a case "where knowledge of administrative procedures might help outsiders to circumvent regulations or standards. Release of the [sanitized] summaries, which constitute quasi-legal records, poses no such danger to the effective operation of the Codes at the Academy." 495 F. 2d, at 265 (footnote omitted). Indeed, the materials sought in this case are distributed to the

---

[5] *E. g., Stokes* v. *Brennan*, 476 F. 2d 699, 703 (CA5 1973); *Hawkes* v. *IRS*, 467 F. 2d 787, 796 (CA6 1972); *Stern* v. *Richardson*, 367 F. Supp. 1316, 1320 (DC 1973); *Consumers Union of United States, Inc.* v. *Veterans Administration*, 301 F. Supp. 796, 801 (SDNY 1969), appeal dismissed as moot, 436 F. 2d 1363 (CA2 1971); *Benson* v. *GSA*, 289 F. Supp. 590, 595 (WD Wash. 1968), aff'd, 415 F. 2d 878 (CA9 1969) (Exemption 2 apparently not raised on appeal).

subjects of regulation, the cadets, precisely in order to assure their compliance with the known content of the Codes.

It might appear, nonetheless, that the House Report's reference to "[o]perating rules, guidelines, and manuals of procedure" supports a much broader interpretation of the exemption than the Senate Report's circumscribed examples. This argument was recently considered and rejected by Judge Wilkey speaking for the Court of Appeals for the District of Columbia Circuit in *Vaughn* v. *Rosen,* 173 U. S. App. D. C., at 193–194, 523 F. 2d, at 1142:

> "Congress intended that Exemption 2 be interpreted narrowly and specifically. In our view, the House Report carries the potential of exempting a wide swath of information under the category of 'operating rules, guidelines, and manuals of procedure. . . .' The House Report states that the exemption 'would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures . . .' and yet it gives precious little guidance as to which matters are covered by the exemption and which are not. Although it is equally terse, the Senate Report indicates that the line sought to be drawn is one between minor or trivial matters and those more substantial matters which might be the subject of legitimate public interest.
>
> "This is a standard, a guide, which an agency and then a court, if need be, can apply with some certainty, consistency and clarity. . . .
>
> "Reinforcing this interpretation is 'the clear legislative intent [of the FOIA] to assure public access to all governmental records whose disclosure would not significantly harm specific governmental interests.'

[*Soucie* v. *David,* 145 U. S. App. D. C. 144, 157, 448 F. 2d 1067, 1080 (1971)]. As a result, we have repeatedly stated that '[t]he policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly.' [*Ibid.; Vaughn* v. *Rosen,* 157 U. S. App. D. C. 340, 343, 484 F. 2d 820, 823 (1973).] Thus, faced with a conflict in the legislative history, the recognized principal purpose of the FOIA requires us to choose that interpretation most favoring disclosure.

"The second major consideration favoring reliance upon the Senate Report is the fact that it was the only committee report that was before both houses of Congress. The House unanimously passed the Senate Bill without amendment, therefore no conference committee was necessary to reconcile conflicting provisions. . . .

". . . [W]e as a court viewing the legislative history must be wary of relying upon the House Report, or even the statements of House sponsors, where their views differ from those expressed in the Senate. As Professor Davis said: 'The basic principle is quite elementary: The content of the law must depend upon the intent of both Houses, not of just one.' [See generally K. Davis, Administrative Law Treatise § 3A.31, p. 175 (1970 Supp.).] By unanimously passing the Senate Bill without amendment, the House denied both the Senate Committee and the entire Senate an opportunity to object (or concur) to the interpretation written into the House Report (or voiced in floor colloquy). This being the case, we choose to rely upon the Senate Report."

For the reasons stated by Judge Wilkey, and because we think the primary focus of the House Report was on exemption of disclosures that might enable the regulated

to circumvent agency regulation, we too "choose to rely upon the Senate Report" in this regard.

The District Court had also concluded in this case that the Senate Report was "the surer indication of congressional intent." Pet. for Cert. 34A n. 21. The Court of Appeals found it unnecessary to take "a firm stand on the issue," concluding that "the difference of approach between the House and Senate Reports would not affect the result here." 495 F. 2d, at 265. The different conclusions of the two courts in applying the Senate Report's interpretation centered upon a disagreement as to the materiality of the public significance of the operation of the Honor and Ethics Codes. The District Court based its conclusion on a determination that the Honor and Ethics Codes "[b]y definition . . . are meant to control only those people in the agency. . . . The operation of the Honor Code cannot possibly affect anyone outside its sphere of voluntary participation which is limited by its function and its publication to the Academy." Pet. for Cert. 34A. The Court of Appeals on the other hand concluded that under "the Senate construction of Exemption Two, [the] case summaries . . . clearly fall outside its ambit" because "[s]uch summaries have a substantial potential for public interest outside the Government." 495 F. 2d, at 265.

We agree with the approach and conclusion of the Court of Appeals. The implication for the general public of the Academy's administration of discipline is obvious, particularly so in light of the unique role of the military. What we have said of the military in other contexts has equal application here: it "constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff* v. *Willoughby,* 345 U. S. 83, 94 (1953), in which the internal law of command and obedience invests the military officer with "a particular position of responsibility." *Parker* v. *Levy,*

417 U. S. 733, 744 (1974). Within this discipline, the accuracy and effect of a superior's command depends critically upon the specific and customary reliability of subordinates, just as the instinctive obedience of subordinates depends upon the unquestioned specific and customary reliability of the superior.[6] The importance of these considerations to the maintenance of a force able and ready to fight effectively renders them undeniably significant to the public role of the military. Moreover, the same essential integrity is critical to the military's relationship with its civilian direction. Since the purpose of the Honor and Ethics Codes administered and enforced at the Air Force Academy is to ingrain the ethical reflexes basic to these responsibilities in future Air Force officers, and to select out those candidates apparently unlikely to serve these standards, it follows that the nature of this instruction—and its adequacy or inadequacy—is significantly related to the substantive public role of the Air Force and its Academy. Indeed, the public's stake in the operation of the Codes as they affect the training of future Air Force officers and their military careers is underscored by the Agency's own proclamations of the importance of cadet-administered Codes to the Academy's educational and training program. Thus, the Court of Appeals said, and we agree:

"[Respondents] have drawn our attention to various

---

[6] The Honor Reference Handbook of the Air Force Cadet Wing 1 (1970) recites:

"Former Secretary of War, Newton Baker, said, '. . . the inexact or untruthful soldier trifles with the lives of his fellow men and with the honor of his government. . . .' The young officer needs to be able to trust his men as does any commander. In these times of expensive and increasingly complex weapons systems, the officer must rely on fellow officers and airmen for his own safety and the safety of his men." App. 47.

items such as newspaper excerpts, a press conference by an Academy officer and a White House Press Release, which illustrate the extent of general concern with the working of the Cadet Honor Code. As the press conference and the Press Release show, some of the interest has been generated—or at least enhanced—by acts of the Government itself. Of course, even without such official encouragement, there would be interest in the treatment of cadets, whose education is publicly financed and who furnish a good portion of the country's future military leadership. Indeed, all sectors of our society, including the cadets themselves, have a stake in the fairness of any system that leads, in many instances, to the forced resignation of some cadets. The very study involved in this case bears additional witness to the degree of professional and academic interest in the Academy's student-run system of discipline. . . . [This factor] differentiate[s] the summaries from matters of daily routine like working hours, which, in the words of Exemption Two, do relate '*solely* to the internal personnel rules and practices of an agency.'" 495 F. 2d, at 265 (emphasis in Court of Appeals opinion).

In sum, we think that, at least where the situation is not one where disclosure may risk circumvention of agency regulation, Exemption 2 is not applicable to matters subject to such a genuine and significant public interest. The exemption was not designed to authorize withholding of all matters except otherwise secret law bearing directly on the propriety of actions of members of the public. Rather, the general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to

have an interest.[7] The case summaries plainly do not fit that description. They are not matter with merely internal significance. They do not concern only routine matters. Their disclosure entails no particular administrative burden. We therefore agree with the Court of Appeals that, given the Senate interpretation, "the Agency's withholding of the case summaries (as edited to preserve anonymity) cannot be upheld by reliance on the second exemption." *Id.*, at 266.[8]

## IV

Additional questions are involved in the determination whether Exemption 6 exempts the case summaries from mandatory disclosure as "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The first question is whether the clause "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" modifies "personnel and medical files" or only "similar files." The Agency argues that Exemption 6 distinguishes "personnel" from "similar" files, exempting all "personnel files" but only those "similar files" whose disclosure constitutes "a

---

[7] See, *e. g.*, Note, the Freedom of Information Act: A Seven-Year Assessment, 74 Col. L. Rev. 895, 956 (1974); Note, Comments on Proposed Amendments to Section 3 of the Administrative Procedure Act: The Freedom of Information Bill, 40 Notre Dame Law. 417, 445 (1965). See also *Vaughn* v. *Rosen*, 173 U. S. App. D. C. 187, 201, 523 F. 2d 1136, 1150 (1975) (Leventhal, J., concurring).

[8] The Agency suggests that the disclosure of the identities of disciplined cadets through release of the case summaries will weaken the Honor and Ethics Codes, principally because other cadets will be less likely to report misconduct if they cannot be assured of the absolute confidentiality of their reports. But even assuming that this speculation raises an argument under Exemption 2—rather than Exemption 6 alone—it is unpersuasive in light of the deletion process ordered by the Court of Appeals to be conducted on remand.

clearly unwarranted invasion of personal privacy," and that the case summaries sought here are "personnel files." On this reading, if it is determined that the case summaries are "personnel files," the Agency argues that judicial inquiry is at an end, and that the Court of Appeals therefore erred in remanding for determination whether disclosure after redaction would constitute "a clearly unwarranted invasion of personal privacy."

The Agency did not argue its suggested distinction between "personnel" and "similar" files to either the District Court or the Court of Appeals, and the opinions of both courts treat Exemption 6 as making no distinction between "personnel" and "similar" files in the application of the "clearly unwarranted invasion of personal privacy" requirement. The District Court held that "[i]t is only the identifying connection to the individual that casts the personnel, medical, and similar files within the protection of [the] sixth exemption." Pet. for Cert. 30A–31A. The Court of Appeals stated: "[W]e are dealing here with 'personnel' or 'similar files.' But the key words, of course, are 'a clearly unwarranted invasion of personal privacy' . . . ." 495 F. 2d, at 266.

We agree with these views, for we find nothing in the wording of Exemption 6 or its legislative history to support the Agency's claim that Congress created a blanket exemption for personnel files. Judicial interpretation has uniformly reflected the view that no reason would exist for nondisclosure in the absence of a showing of a clearly unwarranted invasion of privacy, whether the documents are filed in "personnel" or "similar" files. See, e. g., Wine Hobby USA, Inc. v. IRS, 502 F. 2d 133, 135 (CA3 1974); Rural Housing Alliance v. United States Dept. of Agriculture, 162 U. S. App. D. C. 122, 126, 498 F. 2d 73, 77 (1974); Vaughn v. Rosen, 157 U. S. App. D. C. 340, 484 F. 2d 820 (1973); Getman v. NLRB, 146 U. S.

App. D. C. 209, 213, 450 F. 2d 670, 674 (1971). Congressional concern for the protection of the kind of confidential personal data usually included in a personnel file is abundantly clear. But Congress also made clear that nonconfidential matter was not to be insulated from disclosure merely because it was stored by an agency in its "personnel" files. Rather, Congress sought to construct an exemption that would require a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act "to open agency action to the light of public scrutiny." The device adopted to achieve that balance was the limited exemption, where privacy was threatened, for "clearly unwarranted" invasions of personal privacy.

Both House and Senate Reports can only be read as disclosing a congressional purpose to eschew a blanket exemption for "personnel . . . and similar files" and to require a balancing of interests in either case. Thus the House Report states, H. R. Rep. No. 1497, p. 11: "The limitation of a 'clearly unwarranted invasion of personal privacy' provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual." Similarly, the Senate Report, S. Rep. No. 813, p. 9, states: "The phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information." [9] Plainly

---

[9] The Report states further, S. Rep. No. 813, p. 3:

"At the same time that a broad philosophy of 'freedom of information' is enacted into law, it is necessary to protect certain equally

Congress did not itself strike the balance as to "personnel files" and confine the courts to striking the balance only as to "similar files." To the contrary, Congress enunciated a single policy, to be enforced in both cases by the courts, "that will involve a balancing" of the private and public interests.[10] This was the conclusion of the Court of Appeals for the District of Columbia Circuit as to medical files, and that conclusion is equally applicable to personnel files:

> "Exemption (6) of the Act covers '. . . medical files . . . the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.' Where a purely medical file is withheld under authority of Exemption (6), it will be for the District Court ultimately to determine any dispute as to whether that exemption was properly invoked." *Ackerly* v. *Ley,* 137 U. S. App. D. C. 133, 136–137, n. 3, 420 F. 2d 1336, 1339–1340, n. 3 (1969) (ellipses in original).

See also *Wine Hobby USA, Inc.* v. *IRS, supra,* at 135.

Congress' recent action in amending the Freedom of Information Act to make explicit its agreement with

---

important rights of privacy with respect to certain information in Government files, such as medical and personnel records . . . .

"It is not an easy task to balance the opposing interests, but it is not an impossible one either. It is not necessary to conclude that to protect one of the interests, the other must, of necessity, either be abrogated or substantially subordinated. Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure."

[10] See generally H. R. Rep. No. 1497, p. 11: "A *general* exemption for the category of information is much more practical than separate statutes protecting each type of personal record. The limitation of a 'clearly unwarranted invasion of personal privacy' provides a proper balance . . . ." (Emphasis supplied.) The Senate Report, as well, speaks of a "general exemption" which is "held within bounds by the use of the limitation of 'a clearly unwarranted invasion of personal privacy.'" S. Rep. No. 813, p. 9.

judicial decisions [11] requiring the disclosure of nonexempt portions of otherwise exempt files is consistent with this conclusion. Thus, 5 U. S. C. § 552 (b) (1970 ed., Supp. V) now provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." [12] And § 552 (a)(4)(B) (1970 ed., Supp. V) was added explicitly to authorize *in camera* inspection of matter claimed to be exempt "to determine whether such records *or any part* thereof shall be withheld." (Emphasis supplied.) The Senate Report accompanying this legislation explains, without distinguishing "personnel and medical files" from "similar files," that its effect is to require courts

> "to look beneath the label on a file or record when the withholding of information is challenged. . . .
> ". . . [W]here files are involved [courts will] have to examine the records themselves and require disclosure of portions to which the purposes of the exemption under which they are withheld does not apply." S. Rep. No. 93–854, p. 32 (1974).

---

[11] *E. g., Vaughn* v. *Rosen,* 157 U. S. App. D. C. 340, 345, 484 F. 2d 820, 825 (1973); *Soucie* v. *David,* 145 U. S. App. D. C. 144, 156, 448 F. 2d 1067, 1079 (1971); *Bristol-Myers Co.* v. *FTC,* 138 U. S. App. D. C. 22, 26, 424 F. 2d 935, 938–939 (1970). Accord, *Rural Housing Alliance* v. *United States Dept. of Agriculture,* 162 U. S. App. D. C. 122, 126–127, 498 F. 2d 73, 78 (1974). Cf. 5 U. S. C. § 552 (a)(2)(C) (1970 ed., Supp. V) providing:

"To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, or staff manual or instruction."

[12] The Senate Report on this amendment cited with evident approval the decision of the Court of Appeals in this case remanding to the District Court for redaction of the case summaries to accommodate the dual interests. S. Rep. No. 93–854, pp. 31–32 (1974).

The remarks of Senator Kennedy, a principal sponsor of the amendments, make the matter even clearer.

"For example, deletion of names and identifying characteristics of individuals would in some cases serve the underlying purpose of exemption 6, which exempts 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy.'" 120 Cong. Rec. 17018 (1974).

In so specifying, Congress confirmed what had perhaps been only less clear earlier. For the Senate and House Reports on the bill enacted in 1966 noted specifically that Health, Education, and Welfare files, Selective Service files, or Veterans' Administration files, which as the Agency here recognizes [13] were clearly included within the congressional conception of "personnel files," [14] were nevertheless intended to be subject to mandatory disclosure in redacted form if privacy could be sufficiently protected. As the House Report states, H. R.

[13] Brief for Petitioners 13–16.

[14] There is sparse legislative history as to the precise scope intended for the term "personnel files," a detail which itself suggests that Congress intended that particular characterization not to be critical in the application of Exemption 6. But it is quite clear from the committee reports that the primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters in such files as those maintained by the Department of Health, Education, and Welfare, the Selective Service, and the Veterans' Administration. S. Rep. No. 813, p. 9; H. R. Rep. No. 1497, p. 11. Moreover, the Senate Report on S. 1666, the principal source for the bill ultimately enacted as the Freedom of Information Act, and Exemption 6 in particular, specifically refers to such files as "personnel files." S. Rep. No. 1219, 88th Cong., 2d Sess., 14 (1964). See also Hearings on H. R. 5012 before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 265, 267 (analysis of agency comments on S. 1666) (1965).

Rep. No. 1497, p. 11: "The exemption is also intended to cover detailed Government records on an individual which can be identified as applying to that individual and not the facts concerning the award of a pension or benefit or the compilation of unidentified statistical information from personal records." Similarly, the Senate Report emphasized, S. Rep. No. 813, p. 9: "For example, health, welfare, and selective service records are highly personal to the person involved, yet facts concerning the award of a pension or benefit should be disclosed to the public."

Moreover, even if we were to agree that "personnel files" are wholly exempt from any disclosure under Exemption 6, it is clear that the case summaries sought here lack the attributes of "personnel files" as commonly understood. Two attributes of the case summaries require that they be characterized as "similar files." First, they relate to the discipline of cadet personnel, and while even Air Force Regulations themselves show that this single factor is insufficient to characterize the summaries as "personnel files,"[15] it supports the conclusion that they are "similar." Second, and most significantly, the disclosure of these summaries implicates similar privacy values; for as said by the Court of

---

[15] Air Force Regulations in force at the time of the decisions below drew a distinction between "personnel and medical files," 32 CFR § 806.5 (f) (1974), and "files similar to medical and personnel files," 32 CFR § 806.5 (g) (1974), which clearly categorized case summaries among the latter: "Examples of similar files are those: . . . containing reports, records, and other material pertaining to *personnel matters* in which administrative action, including *disciplinary action,* may be taken or has been taken." 32 CFR § 806.5 (g) (1)(ii) (1974), 36 Fed. Reg. 4701 (1971) (emphasis supplied). After the Court of Appeals' decision, these regulations were amended, *inter alia* deleting the last four words, 32 CFR § 806.23 (f)(1)(ii), 40 Fed. Reg. 7904 (1975), but this alteration is in any event insignificant to the point here.

Appeals, 495 F. 2d, at 267, "identification of disciplined cadets—a possible consequence of even anonymous disclosure—could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends." See generally, e. g., *Wine Hobby USA, Inc.* v. *IRS,* 502 F. 2d, at 135–137; *Rural Housing Alliance* v. *United States Dept. of Agriculture,* 162 U. S. App D. C., at 125–126, 498 F. 2d, at 76–77; *Robles* v. *EPA,* 484 F. 2d 843, 845–846 (CA4 1973). But these summaries, collected only in the Honor and Ethics Code reading files and the Academy's honor records, do not contain the "vast amounts of personal data," S. Rep. No. 813, p. 9, which constitute the kind of profile of an individual ordinarily to be found in his personnel file: showing, for example, where he was born, the names of his parents, where he has lived from time to time, his high school or other school records, results of examinations, evaluations of his work performance. Moreover, access to these files is not drastically limited, as is customarily true of personnel files, only to supervisory personnel directly involved with the individual (apart from the personnel department itself), frequently thus excluding even the individual himself. On the contrary, the case summaries name no names except in guilty cases, are widely disseminated for examination by fellow cadets, contain no facts except such as pertain to the alleged violation of the Honor or Ethics Codes, and are justified by the Academy solely for their value as an educational and instructional tool the better to train military officers for discharge of their important and exacting functions. Documents treated by the Agency in such a manner cannot reasonably be claimed to be within the common and congressional meaning of what constitutes a "personnel file" under Exemption 6.

The Agency argues secondly that, even taking the case summaries as files to which the "clearly unwarranted invasion of personal privacy" qualification applies, the Court of Appeals nevertheless improperly ordered the Agency to produce the case summaries in the District Court for *in camera* examination to eliminate information that could result in identifying cadets involved in Honor or Ethics Code violations. The argument is, in substance, that the recognition by the Court of Appeals of "the harm that might result to the cadets from disclosure" itself demonstrates "[t]he ineffectiveness of excision of names and other identifying facts as a means of maintaining the confidentiality of persons named in government reports . . . ." Brief for Petitioners 17–18.

This contention has no merit. First, the argument implies that Congress barred disclosure in any case in which the conclusion could not be guaranteed that disclosure would not trigger recollection of identity in any person whatever. But this ignores Congress' limitation of the exemption to cases of "clearly unwarranted" [16] invasions

---

[16] The addition of this qualification was a considered and significant determination. *Robles* v. *EPA*, 484 F. 2d 843, 846 (CA4 1973); *Getman* v. *NLRB*, 146 U. S. App. D. C. 209, 213, 450 F. 2d 670, 674 (1971). The National Labor Relations Board and the Treasury Department urged at the hearings on the Act that the "clearly" or "clearly unwarranted" qualification in Exemption 6 be deleted. See Hearings on S. 1160 before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 36 (Treasury), 491 (NLRB) (1965); Hearings on H. R. 5012 before a Subcommittee of the House Committee on Government Operations, 89th Cong., 1st Sess., 56, 230 (Treasury), 257 (NLRB) (1965). See also Hearings on S. 1160, *supra*, at 417 (Department of Defense; objecting to "heavy" burden of showing a *clearly unwarranted* invasion of personal privacy). But see also Hearings on H. R. 5012, *supra*, at 151 (testimony of Clark R. Mollenhoff, Vice Chairman, Sigma Delta Chi Committee for

of personal privacy.[17]   Second, Congress vested the courts
with the responsibility ultimately to determine *"de novo."*
any dispute as to whether the exemption was properly
invoked in order to constrain agencies from withholding
nonexempt matters.[18]   No court has yet seen the case

---

Advancement of Freedom of Information; advocating the retention
of "clearly" in Exemption 6). The terms objected to were neverthe-
less retained, as a "proper balance," H. R. Rep. No. 1497, p. 11, to
keep the "scope of the exemption . . . within bounds," S. Rep. No.
813, p. 9.

The legislative history of the 1974 amendment of Exemption 7,
which applies to investigatory files compiled for law enforcement
purposes, stands in marked contrast.  Under H. R. 12471, 93d
Cong., 2d Sess. (1974), as originally amended and passed by the
Senate, 120 Cong. Rec. 17033, 17040, 17047 (1974), although
not as originally passed by the House, 120 Cong. Rec. 6819–6820
(1974), Exemption 7 was amended to exempt investigatory files com-
piled for law enforcement purposes only to the extent that their
production would "constitute a clearly unwarranted invasion of per-
sonal privacy" or meet one of several other conditions.  In response
to a Presidential request to delete "clearly unwarranted" from the
amendment in the interests of personal privacy, the Conference Com-
mittee dropped the "clearly," 120 Cong. Rec. 33158–33159 (letters
between President Ford and Sen. Kennedy), 34162 (letters between
President Ford and Cong. Moorhead) (1974), and the bill was
enacted as reported by the conference committee, 88 Stat. 1563.

[17] The Court of Appeals held that the argument raised by the
Agency that courts have a broad equitable power to decline to
order release when disclosure would damage the public interest was
not a substantial one in the context of Exemption 6, since that
exemption itself requires a court to exercise a large measure of dis-
cretion.  495 F. 2d, at 269.  The Agency has not renewed this argu-
ment in this Court.

[18] 5 U. S. C. § 552 (a) (4) (B)  (1970 ed., Supp. V).  One of the
prime shortcomings of § 3 of the Administrative Procedure Act, in
the view of the Congress which passed the Freedom of Information
Act, was precisely that it provided no judicial remedy for the un-
authorized withholding of agency records.  *EPA* v. *Mink*, 410 U. S.
73, 79 (1973).

histories, and the Court of Appeals was therefore correct in holding that the function of examination must be discharged in the first instance by the District Court. *Ackerly* v. *Ley*, 137 U. S. App. D. C. 133, 420 F. 2d 1336 (1969); *Rural Housing Alliance* v. *United States Dept. of Agriculture, supra.*

In striking the balance whether to order disclosure of all or part of the case summaries, the District Court, in determining whether disclosure will entail a "clearly unwarranted" invasion of personal privacy, may properly discount its probability in light of Academy tradition to keep identities confidential within the Academy.[19] Respondents sought only such disclosure as was consistent with this tradition. Their request for access to summaries "with personal references or other identifying information deleted," respected the confidentiality interests embodied in Exemption 6. As the Court of Appeals recognized, however, what constitutes identifying information regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar, as fellow cadets or Academy staff, with other aspects of his career at the Academy. Despite the summaries' distribution within the Academy, many of this group with earlier access to summaries may never have identified a particu-

---

[19] The legislative history is clear that Exemption 6 was directed at threats to privacy interests more palpable than mere possibilities. The House Report explains that the exemption was intended to exclude files "the disclosure of which might harm the individual . . . [and] detailed Government records on an individual which *can* be identified as applying to that individual . . . ." H. R. Rep. No. 1497, p. 11 (emphasis supplied). And the Senate Report states that the balance to be drawn under Exemption 6's "clearly unwarranted invasion of personal privacy" clause is one between "the protection of an individual's private affairs from *unnecessary* public scrutiny, and the preservation of the public's right to governmental information." S. Rep. No. 813, p. 9 (emphasis supplied).

lar cadet, or may have wholly forgotten his encounter with Academy discipline. And the risk to the privacy interests of a former cadet, particularly one who has remained in the military, posed by his identification by otherwise unknowing former colleagues or instructors cannot be rejected as trivial. We nevertheless conclude that consideration of the policies underlying the Freedom of Information Act, to open public business to public view when no "clearly unwarranted" invasion of privacy will result, requires affirmance of the holding of the Court of Appeals, 495 F. 2d, at 267, that although "no one can guarantee that all those who are 'in the know' will hold their tongues, particularly years later when time may have eroded the fabric of cadet loyalty," it sufficed to protect privacy at this stage in these proceedings by enjoining the District Court, *id.*, at 268, that if in its opinion deletion of personal references and other identifying information "is not sufficient to safeguard privacy, then the summaries should not be disclosed to [respondents]." We hold, therefore, in agreement with the Court of Appeals, "that the in camera procedure [ordered] will further the statutory goal of Exemption Six: a workable compromise between individual rights 'and the preservation of public rights to Government information.'" *Id.*, at 269.

To be sure, redaction cannot eliminate all risks of identifiability, as any human approximation risks some degree of imperfection, and the consequences of exposure of identity can admittedly be severe. But redaction is a familiar technique in other contexts [20] and exemptions to disclosure under the Act were intended to be prac-

---

[20] The Court of Appeals cited as examples Revenue Rulings collected in the Cumulative Bulletin of the Internal Revenue Service, and American Bar Association, Opinions on Professional Ethics (1967). 495 F. 2d, at 268 n. 18.

tical workable concepts, *EPA* v. *Mink*, 410 U. S., at 79; S. Rep. No. 813, p. 5; H. R. Rep. No. 1497, p. 2. Moreover, we repeat, Exemption 6 does not protect against disclosure every incidental invasion of privacy— only such disclosures as constitute "clearly unwarranted" invasions of personal privacy.

*Affirmed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, dissenting.

If "hard cases make bad law," unusual cases surely have the potential to make even worse law. Today, on the basis of a highly unusual request for information about a unique governmental process, a military academy honor system, the Court interprets definitively a substantial and very significant part of a major federal statute governing the balance between the public's "right to know" and the privacy of the individual citizen.

In my view, the Court makes this case carry too much jurisprudential baggage. Consequently, the basic congressional intent to protect a reasonable balance between the availability of information in the custody of the Government and the particular individual's right of privacy is undermined. In addition, district courts are burdened with a task Congress could not have intended for them.

(1) This case does not compel us to decide whether the summaries at issue here are "personnel files" or whether files so categorized are beyond the proviso of Exemption 6 that disclosure constitute "a clearly unwarranted invasion of personal privacy." Even assuming, *arguendo*, that the Government must show that the summaries are subject to the foregoing standard, it is quite

clear, in my view, that the disclosure of the material at issue here constitutes such an invasion, no matter what excision process is attempted by a federal judge.

The Court correctly notes that Congress, in enacting Exemption 6, intended to strike "a proper balance between the protection of the individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which might harm the individual." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 11 (1966). Having acknowledged the necessity of such a balance, however, the Court, in my view, blandly ignores and thereby frustrates the congressional intent by refusing to weigh, realistically, the grave consequences implicit in release of this particular information, in any form, against the relatively inconsequential claim of "need" for the material alleged in the complaint.

The opinions of this Court have long recognized the opprobrium which both the civilian and the military segments of our society attribute to allegations of dishonor among commissioned officers of our Armed Forces. See, e. g., Parker v. Levy, 417 U. S. 733, 744 (1974), quoting Orloff v. Willoughby, 345 U. S. 83, 91 (1953). The stigma which our society imposes on the individual who has accepted such a position of trust[1] and abused it is not erasable, in any realistic sense, by the passage of time

---

[1] As the Court noted in Orloff v. Willoughby, 345 U. S., at 91: "The President's commission [uses the words] 'reposing special trust and confidence in the patriotism, valor, fidelity and abilities' of the appointee. . . ." An officer may be punitively dismissed (the equivalent of a dishonorable discharge) when found guilty of any offense by a general court-martial, regardless of the limitations placed on the punishment for the offense when committed by enlisted personnel. Manual for Courts-Martial ¶ 126d (1969). See generally United States v. Goodwin, 5 U. S. C. M. A. 647, 18 C. M. R. 271 (1955).

or even by subsequent exemplary conduct. The absence of the broken sword, the torn epaulets, and the Rogue's March from our military ritual does not lessen the indelibility of the stigma. Significantly, cadets and midshipmen—"*inchoate* officers" [2]—have traditionally been held to the same high standards and subjected to the same stigma as commissioned officers when involved in matters with overtones of dishonor.[3] Indeed, the mode of punitive separation as the result of court-martial is the same for both officers and cadets—dismissal. *United States* v. *Ellman*, 9 U. S. C. M. A. 549, 26 C. M. R. 329 (1958). Moreover, as the Court of Appeals noted, it is unrealistic to conclude, in most cases, that a finding of "not guilty" or "discretion" exonerates the cadet in anything other than the purely technical and legal sense of the term.

Admittedly, the Court requires that, before release, these documents be subject to *in camera* inspection with power of excising parts. But, as the Court admits, any such attempt to "sanitize" these summaries would still leave the very distinct possibility that the individual would still be identifiable and thereby injured. In light of Congress' recent manifest concern in the Privacy Act of 1974, 5 U. S. C. § 552a (1970 ed., Supp. V), for "governmental respect for the privacy of citizens . . . ," S. Rep. No. 93–1183, p. 1 (1974), it is indeed difficult to attribute to Congress a willingness to subject an individual citizen to the risk of possible severe damage to his reputation simply to permit law students to invade individual privacy to prepare a law journal article. Its definition of a "clearly unwarranted invasion of personal

---

[2] 7 Op. Atty. Gen. 332 (1855).

[2] Article 133, Uniform Code of Military Justice, 10 U. S. C. § 933, states, for example:

"Any commissioned officer, *cadet, or midshipman* who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct." (Emphasis supplied.)

privacy" as equated with "protect[ing] an individual's private affairs from *unnecessary* public scrutiny . . . ," S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965) (emphasis supplied), would otherwise be rendered meaningless.

(2) Moreover, excision would not only be ineffectual in accomplishing the legislative intent of protecting an individual's affairs from unnecessary public scrutiny, but it would place an intolerable burden upon a district court which, in my view, Congress never intended to inflict. Although the 1974 amendments to the Freedom of Information Act require that "[a]ny reasonably segregable portion of a record . . . ," 5 U. S. C. § 552 (b) (1970 ed., Supp. V), otherwise exempt, be provided, there is nothing in the legislative history of the original Act or its amendments which would require a district court to construct, in effect, a new document. Yet, the excision process mandated here could only require such a sweeping reconstruction of the material that the end product would constitute an entirely new document. No provision of the Freedom of Information Act contemplates a federal district judge acting as a "rewrite editor" of the original material.

If the Court's holding is indeed a fair reflection of congressional intent, we are confronted with a "split-personality" legislative reaction, by the conflict between a seeming passion for privacy and a comparable passion for needless invasions of privacy.

Accordingly, I would reverse the judgment of the Court of Appeals.

MR. JUSTICE BLACKMUN, dissenting.

We are here concerned with the Freedom of Information Act, 5 U. S. C. § 552 (1970 ed. and Supp. V), and with two of the exemptions provided by § 552 (b). The Court in the very recent past has not hesitated consist-

ently to provide force to the congressionally mandated exemptions. See *FAA Administrator* v. *Robertson,* 422 U. S. 255 (1975); *Renegotiation Board* v. *Grumman Aircraft,* 421 U. S. 168 (1975); *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132 (1975); *EPA* v. *Mink,* 410 U. S. 73 (1973). See also *Renegotiation Board* v. *Bannercraft Clothing Co.,* 415 U. S. 1 (1974). Today, I fear, the Court does just the opposite.

A. The Act's second exemption, § 552 (b)(2), extends to matters that are "related solely to the internal personnel rules and practices of an agency." There can be no doubt that the Department of the Air Force, including the faculty and staff who supervise cadets at the Air Force Academy, qualifies as an "agency," within the meaning of § 522 (b)(2), and the Court so recognizes. *Ante,* at 355–356. I would have thought, however, that matters that concern the established Honor Codes of our military academies, codes long in existence and part of our military society and tradition, see *Parker* v. *Levy,* 417 U. S. 733, 743–744 (1974), and the disciplining of cadets as they move along in their Government-supplied education, would clearly qualify as "internal personnel . . . practices" of that agency. By its very nature, this smacks of personnel and personnel problems and practices. It is the agency's internal business and not the public's, and, because it is, the exemption is, or should be, afforded. Thus, although the Court does not, I find great support in the language of the second exemption for the petitioners' position here. To me, it makes both obvious and common sense, and I would hold, as did the District Court, that the Act's second exemption applies to the case summaries respondent Rose so ardently desired, and removes them from his eager grasp.

I cannot accept the rationale of the Court of Appeals majority that the existence of a "substantial potential for

public interest outside the Government," 495 F. 2d 261, 265 (1974), makes these case summaries any less related "solely" to internal personnel rules and practices. Surely, public interest, which is secondary and a by-product, does not measure "sole relationship," which is a primary concept. These summaries involve the discipline, fitness, and training of cadets. They are administered and enforced on an Academy-limited basis by the cadets themselves, and they exist wholly apart from the formal system of courts-martial and the Uniform Code of Military Justice.

B. The Act's sixth exemption, § 522 (b) (6), is equally supportive for the petitioners here and for the result opposite to that which the Court reaches today. This exemption applies to matters that are "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Once again, we have a specific reference to "personnel . . . files," and what I have said above applies equally here. But, in addition, the sixth exemption covers "similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The added restrictive phrase applies not to "personnel," and surely not to "medical files," but only to "similar files." See Robles v. EPA, 484 F. 2d 843, 845–846 (CA4 1973). The emphasis is on personnel files and on medical files and on "similar" files to the extent that privacy invasion of the latter would be unwarranted. The exemption as to personnel files and as to medical files is clear and unembellished. It is almost inconceivable to me that the Court is willing today to attach the qualification phrase to medical files and thereby open to the public what has been recognized as almost the essence of ultimate privacy. The law's long established physician-patient privilege establishes this.

Anyone who has had even minimal contact with the practice of medicine surely cannot agree with this extension by judicial construction and with the reasoning of another Court of Appeals in *Ackerly* v. *Ley,* 137 U. S. App. D. C. 133, 136–137, n. 3, 420 F. 2d 1336, 1339–1340, n. 3 (1969), referred to and seemingly approved by the Court. *Ante,* at 373.

If, then, these case summaries are something less than "personnel files," a proposition I do not accept, they surely are "similar" to personnel files and, when invaded, afford an instance of a "clearly unwarranted invasion of personal privacy." It is hard to imagine something any more personal. It seems to me that the Court is blinding itself to realities when it concludes, as it does, that Rose's demands do not result in invasions of the personal privacy of the cadets concerned. And I do not regard it as any less unwarranted just because there are court-ordered redaction, a most impractical solution, and judicial rationalization that because the case summaries were posted "on 40 squadron bulletin boards throughout the Academy," *ante,* at 355, and copies distributed to faculty and administration officials, the invasion is not an invasion at all. The "publication" is restricted to the Academy grounds and to the private, not public, portions of those facilities. It is disseminated to the corps alone and to faculty and administration, and is a part of the Academy's general pedagogical and disciplinary purpose and program. To be sure, 40 may appear to some to be a large number, but the Academy's "family" and the area confinement are what are important. And the Court's reasoning must apply, awkwardly it seems to me, to 20 or 10 or five or two posting places, or, indeed, to only one.

I should add that I see little assistance for the Court in the legislative history. As is so often the case, that

history cuts both ways and is particularly confusing here. The Court's struggle with it, *ante,* at 362–370, so demonstrates.

Finally, I note the Court's candid recognition of the personal risks involved. *Ante,* at 380–381. Today's decision, of course, now makes those risks a reality for the cadet, "particularly one who has remained in the military," and the risks are imposed upon the individual in return for a most questionable benefit to the public and personal benefit to respondent Rose. So often the pendulum swings too far.

I fear that the Court today strikes a severe blow to the Honor Codes, to the system under which they operate, and to the former cadets concerned. It is sad to see these old institutions mortally wounded and passing away and individuals placed in jeopardy and embarrassment for lesser incidents long past.

I would reverse the judgment of the Court of Appeals.

MR. JUSTICE REHNQUIST, dissenting.

Although this case requires our consideration of a claim of a right to "privacy," it arises in quite a different context from some of our other recent decisions such as *Paul* v. *Davis,* 424 U. S. 693 (1976). In that case custodians of public records chose to disseminate them, and one of the subjects of the record claimed that the Fourteenth Amendment to the United States Constitution prohibited the custodian from doing so. Here the custodian of the records, petitioner Department of the Air Force, has chosen *not* to disseminate the records, and its decision to that effect is being challenged by a citizen under the Freedom of Information Act. That Act, as both the Court's opinion and the dissenting opinion of THE CHIEF JUSTICE point out, requires the federal courts to balance the claim of right of access to the informa-

tion against any consequent "clearly unwarranted invasion of personal privacy." For the reasons stated in Part 2 of the dissenting opinion of THE CHIEF JUSTICE, I agree that the Act did not contemplate virtual reconstruction of records under the guise of excision of a segregable part of the record. I therefore agree with THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN that, in the absence of such redaction, the sixth exemption of the Act is applicable and the judgment of the Court of Appeals should be reversed.